Filed 7/10/26  P. v. Alexander CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>LAONARD ALLEN ALEXANDER,<br>        Defendant and Appellant. | C102511<br><br>(Super. Ct. No. STK-CR-FE-2022-0008686) |

This is a homicide case arising out of a physical altercation at a credit union in Stockton followed by a deadly shooting.  A jury found defendant Laonard Allen Alexander guilty of first degree premeditated and deliberate murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)),[1] with the enhancement of intentionally discharging a firearm that proximately caused death (§ 12022.53, subd. (d)).  The jury also found true the lesser firearm enhancements alleged under section 12022.53, subdivisions (b) and (c).  In a bifurcated proceeding, the trial court found true two circumstances in aggravation, including that defendant had engaged in violent conduct indicating a serious danger to

---

[1]     Undesignated statutory references are to the Penal Code.

1

society.  (Cal. Rules of Court, rule 4.421(b)(1).)[2]  The court sentenced defendant to an aggregate term of 50 years to life in prison.

Defendant appeals, arguing reversal is required for two reasons:  (1) the trial court improperly limited voir dire by depriving him of the opportunity to question prospective jurors—either through the jury questionnaire or counsel—about potential bias related to voluntary manslaughter; and (2) there was insufficient evidence of premeditation and deliberation to support his first degree murder conviction.  We disagree with both contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

It was undisputed defendant shot and killed the victim, and that there were two separate physical altercations involving the victim prior to the shooting, including an altercation with defendant.  At the time of the shooting, defendant was 43 years old, had no prior criminal record, and did not know the victim.  The central issue at trial was whether defendant was guilty of first degree premeditated and deliberate murder or voluntary manslaughter based on a heat of passion theory or an imperfect self-defense theory.

*The Credit Union*

The underlying events occurred at the Golden 1 Credit Union (Golden 1 or credit union) on Pacific Avenue in Stockton.  At trial, the jury was shown video surveillance footage of the shooting, including two separate physical altercations involving the shooting victim, Tyrique Harris.  The video footage was captured by private (Golden 1) and public (City of Stockton) surveillance cameras.

As the evidence presented at trial showed, Golden 1 was located on the east side of Pacific Avenue, which runs north and south.  Except for the west side (next to Pacific

---

[2]     All further rule references are to the California Rules of Court.

Avenue), there were parking spaces on each side of the building. The front entrance and the outside automatic teller machines (ATMs) were located on the north side of the building, with the ATMs to the west of the front entrance. There was no other public entrance or ATM outside the credit union.

*Relevant Events Preceding the Shooting*

On the morning of August 11, 2022, the branch manager of Golden 1--Edward, placed three separate 911 calls. The first call was made around 10:34 a.m., after Edward observed two men fighting with a third man, later identified as Harris. The altercation occurred in the parking lot near the front entrance of Golden 1 (the north side of the building) after Harris approached two men inside a red car and words were exchanged. One of the men in the red car was wearing a red hat. Harris, who was very angry, was wearing a "blue head covering" (or "dew rag") and carrying a blue backpack, which (as later determined by a police search) did not include any weapons.

After the physical altercation ended and the red car drove away from Golden 1, Harris threw his backpack to the ground, took off his shirt, and paced back and forth in the parking lot. Later, Harris approached the line of people waiting to use an ATM, which included defendant and his wife Kelly, who was wearing a red shirt. It was around 10:36 a.m.

As Harris neared the ATM line, he threw his shirt onto defendant's back and then walked away. Moments later, Harris returned to the line and confronted defendant. During this interaction, which occurred after defendant put Harris's shirt in a garbage can, Harris struck defendant with his backpack. Harris also said something "about homosexuality" or something about defendant "being homosexual." In response,

defendant walked away into the parking lot. Harris, who was carrying his backpack,[3] pursued defendant. At Edward's suggestion, defendant went inside Golden 1. Soon afterward, Kelly met defendant at the front entrance. At defendant's direction, Kelly went to defendant's car and retrieved his handgun, which was inside a red bag. At that point, it was around 10:38 a.m.

Meanwhile, around 10:37 a.m., Edward placed a second 911 call to report the physical altercation involving Harris and defendant. Around the same time, Edward prevented Harris from following defendant inside Golden 1. Edward also instructed Harris to leave the area, but he refused. Instead, Harris went to the west side of Golden 1 (the side next to Pacific Avenue). It was around 10:38 a.m. Harris stayed at the west side of the credit union, near the southwest corner of the building, until the shooting occurred approximately 10 minutes later.

Upon questioning at trial, Edward described Harris's behavior as erratic and unpredictable. Although Edward believed that Harris presented a "safety issue" for defendant and other Golden 1 patrons, Edward was not afraid for his own safety.

*The Shooting*

When Edward learned defendant had a gun, he told defendant to leave Golden 1. Edward also informed defendant that the police were on their way. In response, defendant went outside to use an ATM and Kelly went to defendant's car and placed the red bag (with the gun) inside the trunk. By this point, it was around 10:39 a.m.

---

[3] Defendant was also carrying a red and blue hat. Although not entirely clear, it appears from the video evidence that these hats belonged to the men involved in the earlier physical altercation with Harris.

Around 10:44 a.m., two minutes after defendant used the ATM, he drove away from Golden 1.[4] Less than two minutes later, he returned to the area. He drove past the credit union (including Harris's location) twice and then parked on the east (or opposite) side of the building, near the southeastern corner. Defendant then got out of his car and quickly approached Harris along the south side of the credit union. Harris was using his cell phone near the southwest corner of the building. When defendant came around that corner, Harris was facing away from him, toward Pacific Avenue. Without hesitation, defendant fired one or two gunshots at Harris's head from close range, which caused Harris to fall to the ground. Defendant then stood over Harris and fired additional gunshots at his head from point-blank range. By this time, it was 10:47 a.m.

At trial, defendant testified that he was not scared at the time of the shooting. Rather, he was "outraged," angry, and upset because Harris had "attacked" him "multiple times." However, defendant also testified that he "[f]eared for [his] life" at the time of the shooting, which was based on the physical altercations, including the altercation defendant observed involving Harris and the two men from the red car. Although defendant denied that he had a plan to kill Harris or that he "shot to kill" Harris, defendant acknowledged that he shot Harris six times, including multiple times after Harris fell to the ground from the initial gunshot(s). Defendant also said that he was not scared when Harris was on the ground.

*Relevant Postshooting Events*

Around 10:48 a.m., Edward placed a third 911 call to report the shooting. Harris, who was bleeding profusely from his injuries, died at the scene. At trial, the parties stipulated that Harris's cause of death was multiple gunshot wounds (six), including four

---

[4] Before defendant drove away from Golden 1, Kelly went to the trunk of his car and retrieved something. When asked at trial, defendant denied that Kelly retrieved his gun.

gunshots to the head. It was further stipulated that the gunshot wounds to the head entered Harris's left side, and the path of the gunshots were left to right, front to back, and down.

Following the shooting, defendant did not call the police or attempt to render aid to Harris. Instead, he immediately ran to his car and fled the area. Around an hour later, he dropped his car off at his sister's house in Stockton. He then went to Oakland to "get rid of" his gun. After defendant discarded the gun near "the lake" in Oakland, he went to Richmond.

Several weeks later, in September 2022, defendant was arrested in San Pablo.

*Jury Instructions*

At the close of trial, which spanned multiple days in August 2024, the trial court instructed the jury orally and in writing. Of particular relevance here, the court gave the jurors pattern instructions on homicide: general principles (CALCRIM No. 500); justifiable homicide: self-defense or defense of another (CALCRIM No. 505); first or second degree murder with malice aforethought (CALCRIM No. 520); first degree murder on the theory of a deliberate and premeditated killing (CALCRIM No. 521); provocation: effect on degree of murder (i.e., provocation as reducing murder from first to second degree or manslaughter) (CALCRIM No. 522); and voluntary manslaughter on theories of heat of passion and imperfect self-defense or imperfect self-defense of another (CALCRIM Nos. 570, 571). The trial court also instructed the jurors on the right to use force in self-defense (CALCRIM No. 3474),[5] reasonable doubt (CALCRIM No. 220),

---

[5] In relevant part, CALCRIM No. 3474 provides that a person has the right to use force in self-defense "only as long as the danger exists or reasonably appears to exist." When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends. (*Ibid.*)

and to follow the law as explained by the court, even if they disagreed with it (CALCRIM No. 200).

*Jury Deliberations*

The jury began its deliberations on the afternoon of August 28, 2024. Around 4:00 p.m., the jury sent a note to the trial court. Among other things, the jury asked for a readback of "defendant's entire testimony" and for the court to "[d]efine the difference between deliberate and premeditated." Around 9:20 a.m. the following morning, the jury sent another note to the trial court, which asked for a readback of the prosecutor's closing argument; specifically, the portion where the prosecutor defined and discussed the terms willful, deliberate, and premeditated.

The trial court provided a written response to each note. As for the first note, the court gave the jurors the definition of premeditation and deliberate (as set forth in the relevant pattern jury instruction—CALCRIM No. 521) and then instructed the jurors that they must find that the killing was both premediated and deliberate to convict defendant of first degree murder. The court also advised the jurors that the court reporter would read defendant's testimony as requested. As for the second note, the court informed the jurors that the prosecutor's closing argument would not be read back to them because closing arguments are not evidence.

Around 10:30 a.m., the jury reached a verdict.

*Verdict and Sentencing*

The jury found defendant guilty as charged: first degree premeditated and deliberate murder. (§§ 187, subd. (a), 189, subd. (a).) In doing so, the jury rejected the defense theories of voluntary manslaughter based on heat of passion or imperfect self-defense. Additionally, the jury found true the firearm enhancement allegations, including that defendant intentionally discharged a firearm that proximately caused death.

After finding true two circumstances in aggravation,[6] the trial court sentenced defendant to an aggregate term of 50 years to life in prison.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Jury Selection*

Defendant first argues the trial court improperly limited voir dire by depriving him of the opportunity to question prospective jurors—either through the jury questionnaire or counsel—about potential bias related to voluntary manslaughter.[7]

A. *Additional Background*

The defense theory was that defendant was not guilty of first degree murder but rather voluntary manslaughter. During opening statements, defense counsel claimed the evidence would show that defendant shot Harris "out of fear" and because of "violent provocation." In closing argument, defense counsel asserted that Harris was a violent and unpredictable person, and argued that defendant was not guilty of first degree murder because he was provoked by Harris and "acted rashly" while "under the influence of …

---

[6]    The trial court found true the allegations that the offense involved great violence and great bodily harm, which disclosed a high degree of cruelty, viciousness, or callousness (Rule 4.421 (a)(1)), and that defendant had engaged in violent conduct indicating a serious danger to society (Rule 4.421 (b)(1).)

[7]    As an aside, defendant devotes seven pages of his opening brief to explaining why the trial court's replacement of Juror No. 11 with Alternate Juror No. 4 does not affect his challenge to the voir dire of the venire. Because we do not see that substitution as bearing on the claim before us and because defendant does not assert as a distinct claim of error that Juror No. 11 was wrongfully discharged, we need not and do not say anything further about it.

8

intense emotion[s]" (anger and fear).[8]  In other words, the defense theory was that defendant did not act with the mental state required for murder (malice aforethought), and therefore was liable for voluntary manslaughter based on a heat of passion or imperfect self-defense theory.  (See *People v. Schuller* (2023) 15 Cal.5th 237, 252 [two mitigating circumstances reduce an intentional, unlawful killing from murder to manslaughter by negating the element of malice:  (1) when a person kills in a sudden quarrel or heat of passion, or (2) when a person kills in unreasonable (or imperfect) self-defense].)[9]

Prior to jury selection, the trial court, in connection with a motion in limine filed by the prosecution, viewed the video surveillance footage of the shooting and the two physical altercations that preceded the shooting, including the altercation involving defendant and Harris.  Later, the trial court granted the prosecutor's motion to use a questionnaire for jury selection and advised the parties that they would be given 45 minutes to question (or voir dire) the initial panel of prospective jurors and then an additional 45 minutes to question new prospective jurors after members of the initial

---

[8]    As part of this argument, defense counsel claimed that defendant was "unusually sensitive to violence" because (as defendant testified) he was "beat up by the police" when he was 15 years old (i.e., approximately 30 years before the shooting).  Because of the trauma from this incident and because of the two physical altercations involving Harris at Golden 1, defense counsel argued that the shooting was an impulsive response to the "violent [and] unpredictable situation" created by Harris.

[9]    Manslaughter, which is a lesser included offense of murder, is " 'the unlawful killing of a human being without malice.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)  "California law recognizes two circumstances where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' [citation]:  (1) when a person kills ' " 'in a "sudden quarrel or heat of passion" [citation], or ... [(2) when a person] kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' " ' [Citation.]  'These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide [citation]." ' " (*People v. Schuller, supra*, 15 Cal.5th at p. 252.)

panel were excused. The court made clear that it would not be posing any questions to prospective jurors in addition to those included in the questionnaire, explaining that the questionnaire was the court's voir dire.

During a subsequent hearing, defense counsel indicated that the parties could not agree on certain questions to include in the jury questionnaire. As relevant here, defense counsel wanted to ask the following question: "The law provides that in certain circumstances a killing may be voluntary manslaughter instead of murder, would you be able to follow that law or do you believe a killing must always be murder?" When asked, defense counsel explained that the purpose of this question was to determine whether prospective jurors could "follow the law." The prosecutor objected to the "fact specific" and "pinpointed" nature of the question, explaining that, in her view, jury questionnaires "are more for finding out if people can be fair or follow the law[], not necessarily to find out their opinions on [a] particular case or set of facts." In making this objection, the prosecutor noted that she was proposing to include some general questions in the questionnaire that would ask prospective jurors if they could follow the law given by the court even if they disagreed with it.

In denying defense counsel's request to include the proposed question in the jury questionnaire, the trial court stated: "It is too narrow and pinpointed .… You don't even [know] that I'm going to be giving [a] voluntary manslaughter [instruction]. And [the prospective jurors] don't even know what the law is or the definition of voluntary, so … I'm not going to allow that."

Prospective jurors were given a 10-page questionnaire that included 36 questions and the following summary of the case: "Laonard Alexander is accused of willful, deliberate, pre-meditated murder of Tyrique Harris on August 11, 2022 at the Golden One Bank in Stockton. It is further alleged that the Defendant personally and intentionally used a firearm during the murder, which caused the victim's death."

During the oral examination phase of voir dire, the following exchange occurred:

10

"THE COURT: We're back on the record. We're outside the presence of the jury. The parties and the defendant are present. [¶] I stopped defense [counsel] from reading [a] heat of passion [instruction] to the jury. I said to him that's not the basis for a challenge for cause. That's just a way to get your defense in front of the jury and it's too specific. So … defense [counsel] … had an objection [he] wanted to give.… Go ahead and state your reasons.

"[DEFENSE COUNSEL]: The court instructed me not to voir dire regarding both heat of passion and imperfect self-defense [which] hamstrings my ability to see whether the jurors would follow the law with respect to those instructions. And I have a good faith belief that both of those instructions will be coming in.

"THE COURT: I'll hear if the [prosecutor] has any input.

"[PROSECUTOR]: I agree with the court's position that it's too specific for voir dire.

"THE COURT: So I give the law. I haven't given those laws yet. And as it stands right now there is no self-defense issue in this case. I did allow you to put self-defense on the questionnaire in general. Voir dire is not to indoctrinate a jury on your side of the case or what you believe your defense to be. It's just to ask general questions about biases in general, generalization about whether they can follow the law, and that's why I'm not going to allow it. I would have the [prosecutor] going up there and pointing out her parts of the law. So we're not going to do that here."

During this discussion, defense counsel did not articulate any specific question he wanted to ask prospective jurors after he read the voluntary manslaughter instruction.

B. *Applicable Legal Principles*

"The Sixth Amendment of the United States Constitution guarantees the right of a defendant in all criminal prosecutions to a trial by an 'impartial jury.' The California Constitution independently guarantees the right to trial by an impartial jury. [Citations.] 'The Sixth Amendment right to an impartial jury and the due process right to a

11

fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court." ' [citation.] '[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 402-403.)

The term "voir dire" refers to the process by which prospective jurors are questioned to determine their competency to serve. (See *In re Boyette* (2013) 56 Cal.4th 866, 888.) Literally translated from French, "voir dire" means "to speak the truth." (See Black's Law Dictionary (11th ed. 2019) p. 1885.) Since written questionnaires serve as an alternative to oral disclosure of the same information, courts view them as a part of voir dire (or jury selection) process. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 634; Code Civ. Proc., §§ 222.5, subd. (f) & 223, subd. (e).)

The "main object of voir dire" is to " 'ferret[] out bias and prejudice on the part of prospective jurors.' " (*People v. Mello* (2002) 97 Cal.App.4th 511, 518; see *In re Boyette, supra,* 56 Cal.4th at p. 888 [voir dire serves to protect a criminal defendant's right to a fair trial by " ' "exposing possible biases, both known and unknown, on the part of potential jurors" ' "].) In the criminal context, the purpose of voir dire is to assist counsel in the intelligent exercise of challenges for cause. (Code Civ. Proc., § 223, subd. (d) [counsel's examination of prospective jurors in criminal cases may be conducted "only in aid of the exercise of challenges for cause"]; see also *People v. Debose* (2014) 59 Cal.4th 177, 194.) By contrast, it is *not* the function of voir dire to " ' "educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law." ' " (*People v. Landry* (2016) 2 Cal.5th 52, 83; see *People v. Tate* (2010) 49 Cal.4th 635, 657 [a defendant has no right to ask specific questions that instruct the jury in matters of law].)

California's Code of Civil Procedure contains a statutory framework designed to implement the constitutional right to trial by an impartial jury and describes the circumstances in which a potential juror can be excluded from service. (See, e.g., Code Civ. Proc., §§ 223, 225.) In criminal cases, after completion of an initial examination by the court, counsel "have the right to examine, by oral and direct questioning, any of the prospective jurors." (*Id*., § 223, subd. (b)(1).) "During any examination conducted by counsel for the parties, the trial judge shall permit liberal and probing examination calculated to discover bias or prejudice with regard to the circumstances of the particular case or the parties before the court." (*Ibid*.) However, the court may limit the scope of the examination conducted by counsel. (See *ibid*. [the "scope of the examination conducted by counsel shall be within reasonable limits prescribed by the trial judge in the judge's sound discretion"].)

Code of Civil Procedure section 225 permits a challenge of a prospective juror for cause in the following circumstances: "(A) General disqualification" (see *id*., § 203, subd. (a) [identifying those generally disqualified]), "(B) Implied bias--as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror," or "(C) Actual bias--the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (*Id*., § 225, subd. (b).)

" 'Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored.' " (*People v. Debose, supra*, 59 Cal.4th at p. 194, italics omitted.) The California Supreme Court has recognized that " 'part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.' [Citation.] Prospective jurors are unqualified if their views would prevent or substantially impair their performance in accordance with the instructions and oath. [Citation.] Inadequate voir dire prevents the

13

trial court from removing prospective jurors who will not follow the court's instructions." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 902, italics omitted; see *Debose*, at p. 194 [without an adequate voir dire, the trial court cannot fulfill its responsibility to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence].)

As our Supreme Court has explained: " 'There is no constitutional right to voir dire per se. Nor is there any constitutional right to conduct voir dire in a particular manner. [Citation.] Rather, the voir dire process serves as a means of implementing the defendant's Sixth Amendment right to an impartial jury. [Citations.] [¶] Consistent with applicable statutory law, the trial court has wide latitude to decide the questions to be asked on voir dire [citation], and to select the format in which such questioning occurs [citation]. The court likewise has broad discretion to contain voir dire within reasonable limits.' [Citations.] Thus, ' " 'content' questions," even ones that might be helpful, are not constitutionally required. [Citation.] To be an abuse of discretion, the trial court's failure to ask questions "must render the defendant's trial fundamentally unfair." [Citation.] "Such discretion is abused 'if the questioning is not reasonably sufficient to test the jury for bias or partiality.' " ' " (*People v. Landry, supra,* 2 Cal.5th at p. 83.)

The considerable discretion trial courts have in determining the scope of voir dire extends to the wording of a jury questionnaire. Where the court exercises its discretion to exclude certain questions from the questionnaire, "we will affirm unless the voir dire was so inadequate that the resulting trial was fundamentally unfair." (*People v. Leon* (2015) 61 Cal.4th 569, 586.) Voir dire error requires reversal only if it results in a "miscarriage of justice." (See Code Civ. Proc., § 223, subd. (g).)

Although the "miscarriage of justice" standard is often equated with the "reasonable probability" test our Supreme Court established in *People v. Watson* (1956) 46 Cal.2d 818, 836, in reviewing decisions regarding jury selection, courts have not attempted to evaluate whether a defendant would have likely obtained a better outcome at

14

trial in the absence of the asserted error. Instead, courts have examined whether the trial court's error "affected" the defendant's right to a "fair and impartial jury." (*People v. Asbury* (2016) 4 Cal.App.5th 1222, 1229-1230.) In order for reversal to be appropriate, the trial court must have so limited the scope of voir dire that " ' "the procedure used for testing does not create any reasonable assurances that prejudice would be discovered if present." ' " (*Id.* at p. 1230.)

C. *Analysis*

We see no basis for reversal here. The record shows that defense counsel was provided the opportunity to elicit information on voir dire by proposing questions to be included in the jury questionnaire. The trial court also allowed defense counsel to ask questions of prospective jurors during the oral examination phase of voir dire. These procedures provided an adequate basis upon which defense counsel was able to identify unqualified jurors and exercise challenges for cause. The jury questionnaire and the follow-up oral questions from counsel covered a range of issues necessary to test prospective jurors for bias or partiality, including questions that elicited details about the prospective jurors' backgrounds, their attitudes about law enforcement, gun ownership, certain aspects of the criminal justice system (e.g., presumption of innocence, defendant's right to remain silent), and their ability to follow the law as explained to them by the court, including the law regarding the burden of proof and self-defense. For example, the jury questionnaire included the following question: "The law provides that, in certain circumstances, lethal force can be used in self-defense. Would you be able to follow the law, or do you believe that lethal force should never be used?"

On this record, we conclude the trial court did not abuse its broad discretion in limiting the questions defense counsel could ask prospective jurors. In our view, the abstract and vague question defendant wanted to include in the jury questionnaire about voluntary manslaughter would not have been particularly helpful in uncovering bias or partiality on the part of prospective jurors. As trial counsel acknowledged, the proposed

15

question, as worded, was simply a way of asking the jurors if they would follow the law regarding the undefined legal concepts of murder and voluntary manslaughter.

Other questions included in the jury questionnaire explored whether prospective jurors could follow the law. Under these circumstances, the trial court could have reasonably determined that the proposed question was unnecessary, especially given its non-specific nature and the fact that the questionnaire included multiple questions designed to uncover the ability of prospective jurors to follow the law. Further, the proposed question was not well-tailored to provide a meaningful exploration of the prospective jurors' attitudes toward voluntary manslaughter, including the specific legal doctrines used to reduce a charge from murder to voluntary manslaughter—the heat of passion doctrine or the imperfect self-defense doctrine. Because the proposed question did not include the relevant content of these legal doctrines, it bore little potential for exposing prejudice or a resistance to applying them. In short, we cannot conclude the trial court's decision to exclude defense counsel's proposed question about voluntary manslaughter from the jury questionnaire exceeded the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

Likewise, the trial court did not abuse its discretion in prohibiting defense counsel from reading, and then asking questions to prospective jurors about, a jury instruction on voluntary manslaughter. The court did so to avoid forcing prospective jurors to respond to questions involving a specific legal concept on which they had not yet been instructed and to avoid the danger of indoctrinating the jury on the defense's particular view of the case. It is well-established that trial courts have broad discretion to limit questions where the line of inquiry suggests they were being offered for a "prohibited purpose," such as indoctrinating the jury or instructing the jury in matters of law. (*People v. Hoyt* (2020) 8 Cal.5th 892, 915; see Code Civ. Proc, § 223, subd. (b)(3) [for purposes of voir dire in criminal cases, "an 'improper question' is any question that, as its dominant purpose,

16

attempts to precondition the prospective jurors to a particular result or indoctrinate the jury"].)

Here, during the oral examination phase of voir dire, defense counsel never articulated the specific questions he wanted to ask prospective jurors related to the voluntary manslaughter instruction and explain how such questions were designed to uncover bias or partiality on the part of prospective jurors. Nor did defense counsel attempt to explore prospective jurors' attitudes toward voluntary manslaughter.

On appeal, defendant concedes that reading a jury instruction during voir dire is generally not permitted. Nevertheless, he insists the trial court abused its discretion in prohibiting the challenged line of voir dire inquiry. We are unpersuaded. Nothing in the record indicates the court's limitation resulted in a fundamentally unfair trial or miscarriage of justice. Further, defendant has not directed us to any portion of the record suggesting that any juror was too biased to serve or was actually prejudiced against the defense theory of voluntary manslaughter.

Ultimately, defendant has not shown, and the record does not reflect, that the manner in which the trial court conducted voir dire failed to create any reasonable assurances that prejudice would be discovered if present. As we have observed, defense counsel never articulated the specific questions he wanted orally to ask prospective jurors related to the voluntary manslaughter instruction and explain how those questions would have uncovered bias, partiality, or prejudice. (See *People v. Asbury*, *supra*, 4 Cal.App.5th at pp. 1230-1232 [no miscarriage of justice where the defendant failed to explain what additional questions over and above what he already asked would have uncovered bias].)[10] And we cannot conclude that the abstract and vague question defense

---

**10** In his opening brief on appeal, defendant insists the trial court's "generalized inquiry" as to whether prospective jurors could apply legal standards and burdens of

17

counsel proposed to include in the jury questionnaire about voluntary manslaughter was "so significantly more likely 'to expose strong attitudes antithetical to defendant's cause' " that the voir dire in the present case resulted in a fundamentally unfair trial. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 655.)[11]

---

proof that apply in every criminal case was not sufficient "to supply the basis for constitutionally adequate voir dire here." In support of his position, defendant explained as follows:

"The question of whether the jurors would follow the instructions on voluntary manslaughter, heat of passion, and imperfect self defense, even if they disagreed with them, was the thorough voir dire question that [was] required to be asked in order to find the voir dire constitutionally adequate. This is because the only contested issue the jury had to decide was whether the homicide here was deliberate and premeditated, or whether [defendant's] legal culpability was mitigated by the heat of passion and/or imperfect self-defense such that would have reduced his culpability from murder to voluntary manslaughter. *The heat of passion and imperfect self-defense principles of voluntary manslaughter are the 'special circumstances' that constitutionally required the trial court to pursue this line of questioning in order to avoid a trial that was 'fundamentally unfair.'* " (Italics added.)

Later in his briefing, defendant asserts the trial court "should have conducted, or permitted defense counsel to conduct, voir dire establishing a lack of bias and impartiality to each of the[] components of the voluntary manslaughter instructions." In other words, defendant contends the trial court prejudicially erred by not allowing (or conducting) a more extensive inquiry about the prospective jurors' views regarding voluntary manslaughter. We disagree. As defendant concedes, there is no case law holding that voluntary manslaughter, based on either a heat of passion theory or imperfect self-defense theory, constitutes a "special circumstance" for purposes of voir dire. (See *People v. Robinson* (2005) 37 Cal.4th 592, 620-621 [" 'an interracial crime is a "special circumstance" ' " in which a specific inquiry regarding possible racial bias against the defendant should be made].) Nor has defendant shown that the manner in which the trial court conducted voir dire was so inadequate that the resulting trial was fundamentally unfair.

[11]    In urging a different result, defendant relies heavily on *People v. Williams* (1981) 29 Cal.3d 392, superseded by statute on other grounds as stated by *People v. Noguera* (1992) 4 Cal.4th 599 at pages 645-646. But *Williams* is distinguishable and therefore of no assistance to him. As our Supreme Court explained in *Fuiava*, one of the central

18

## II
### *Sufficiency of the Evidence*

Next, defendant argues there was insufficient evidence of premeditation and deliberation to support his first degree murder conviction.

### A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

" 'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence…. "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not

---

holdings in *Williams* was abrogated by the passage of Proposition 115, which " 'changed the scope of legitimate inquiry on voir dire by requiring that the examination of prospective jurors [in criminal cases] be conducted only in aid of the exercise of challenges for cause,' not in aid of the parties' making peremptory challenges." (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 655.) The *Fuiava* court explained that the "erroneous limitation of voir dire that led to [the] reversal of the judgment in *Williams* concerned the prospective jurors' thoughts regarding the [controversial] legal concept that a person has no duty to retreat before he or she may use reasonable force to resist an attacker," and there was " 'a real possibility the average juror might disagree' with the rule." (*Fuiava*, at p. 655.) Having carefully reviewed *Williams*, we conclude that it supplies no basis for reversal.

reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

B.  *Applicable Legal Principles*

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  If the murder is "willful, deliberate, and premeditated," it is first degree murder.  (*Id*., § 189, subd. (a).)  " ' "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.]  ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.]  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.…' [Citation.]  Such reflection may be revealed by planning activity, motive, and the manner of the killings, among other things." (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

As our Supreme Court has explained:  "The type of evidence … sufficient to sustain a finding of premeditation and deliberation falls into three basic categories:  (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the

20

nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27; see also *People v. Morales* (2020) 10 Cal.5th 76, 88-89.)

The *Anderson* categories (or factors) are "descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.) Evidence of all three *Anderson* factors is not essential to sustain a conviction. (*People v. Edwards* (1991) 54 Cal.3d 787, 813, overruled on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, as recognized by *People v. McDaniel* (2021) 12 Cal.5th 97, 138); see *People v. Romero* (2008) 44 Cal.4th 386, 401 ["A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner"].) In fact, the method of killing by itself may support a conclusion that sufficient evidence supports a finding of premeditated and deliberate murder. (*People v. Memro* (1995) 11 Cal.4th 786, 863-864.)

C. *Analysis*

Applying the *Anderson* framework to the facts of this case, we have little difficulty concluding that sufficient evidence supports the jury's finding of premeditated and deliberate first degree murder. The record contains ample evidence from which a rational trier of fact could have concluded that defendant's killing of Harris was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.

As for the first *Anderson* factor (planning activity), the jury could have reasonably inferred that defendant's actions prior to the shooting demonstrated that he acted with premeditation and deliberation when he killed Harris. The evidence showed that, after the physical altercation between Harris and defendant near the front entrance of Golden 1

21

(which included Harris striking defendant with a backpack), defendant walked away from Harris and eventually went inside the credit union. Meanwhile, Harris went to the west side of the credit union, near the southwest corner of the building. After defendant used the ATM, he drove away from the credit union. Less than two minutes later, he returned to the area. He drove past the credit union (including Harris's location) twice. Defendant then parked on the east (or opposite) side of the credit union, got out, and quickly approached Harris from behind along the south side of the building. When defendant reached Harris, he immediately opened fire from close range; defendant shot Harris six times, including multiple gunshots to Harris's head at point-blank range after the initial gunshot(s) caused Harris to fall to the ground. The shooting occurred approximately 10 minutes after the physical altercation between Harris and defendant. Under these circumstances, a reasonable jury could have concluded that defendant had time to reflect upon and plan the shooting. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [that "defendant brought a loaded handgun with him … indicating he had considered the possibility of a violent encounter"].)

As for the second *Anderson* factor (motive), there was significant evidence from which a rational trier of fact could have inferred a motive to kill, and that the killing was the result of preexisting reflection and careful thought rather than a mere unconsidered rash impulse. Such evidence included the physical altercation between defendant and Harris, and defendant's admission at trial that he was angry and upset at Harris at the time of the shooting because Harris had "attacked" him "multiple times." From this evidence and the video surveillance evidence, the jury could have reasonably concluded that defendant formed a plan to use his loaded gun between the time of the physical altercation with Harris and the deadly shooting.

As for the third *Anderson* factor (manner of the killing), the record includes strong and compelling evidence from which the jury could have inferred that the manner of killing was so exacting that defendant must have killed according to a preconceived

22

design to take Harris's life. The killing involved a sudden attack on an unarmed and unsuspecting victim. At close range, defendant fired six gunshots at Harris, including multiple gunshots at Harris's head after Harris fell to the ground from the initial gunshot(s). This execution-style manner of killing especially supports the jury's determination that the killing of Harris was premeditated and deliberate. (See *People v. Salazar* (2016) 63 Cal.4th 214, 246 [shooting the victim nine times at close range supports the conclusion that the killing was deliberate]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [firing a gunshot at a vital area of the victim's body at close range represented "a manner of killing indicative of a deliberate intent to kill"].)

Additionally, defendant's conduct following the shooting was indicative of a deliberate intent to kill Harris. Defendant did not attempt to render aid to Harris, call 911, or seek out medical assistance for him. Instead, defendant immediately ran to his car and fled the area. He dropped his car off at his sister's house in Stockton, went to Oakland, and then disposed of his gun near a lake in Oakland. From this evidence, the jury could have reasonably inferred that defendant carried out a deliberate plan to kill Harris. (See *People v. Disa* (2016) 1 Cal.App.5th 654, 667 [jury may consider the "defendant's conduct after the killing in relation to the manner of killing"].)

In sum, there is no basis for reversing the jury's first degree murder finding. The record contains abundant evidence to support the jury's determination that defendant acted with premeditation and deliberation when he shot and killed Harris.

We reject the various arguments defendant advances for a different result, including his contention that the evidence was insufficient to support a finding of premeditation and deliberation because there was evidence that he killed Harris under heat of passion because of Harris's provocation. Even assuming a reasonable jury could have concluded the evidence did not support a finding of premeditation and deliberation and returned a verdict of voluntary manslaughter, defendant's first degree murder conviction " 'must stand because … "[i]f the circumstances reasonably justify the jury's

23

findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." ' " (*People v. Salazar, supra,* 63 Cal.4th at p. 245.)

## DISPOSITION

The judgment is affirmed.

/s/
WISEMAN, J.*

We concur:

/s/
ROBIE, Acting P. J.

/s/
FEINBERG, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.